**In re R–P PACKAGING, INC. d/b/a Columbus Packaging, Debtor.**

**Plicon Corporation, Debtor.**

**Bankruptcy No. 99–42537.
Adversary No. 00–41153.**

United States Bankruptcy Court,
M.D. Georgia,
Columbus Division.

March 21, 2002.

Daniel M. Shea, Smith, Currie & Hancock LLP, J. Robert Williamson, Atlanta, GA, for debtor.

W. Wright Banks, Jr., Assistant Attorney General, Atlanta, GA, John Brunsman, Asst. Attorney General, Springfield, IL, Michael P. Cielinski, Attorney Office, Richard E. Flowers, H. Owen Lee, Miller, Layfield & Lee, P.C., Robert R. Lomax, Denney, Pease, Allison Kirk and Lomax, Charles W. Miller, Columbus, GA, David Cohen, New York City, James W. Hays, Lesley A. Troope, Stanford, Fagan & Giolito, Frank B. Wilensky, Macey, Wilensky, Cohen, J. Robert Williamson, Atlanta, GA, for creditors.

### MEMORANDUM OPINION

JOHN T. LANEY, III, Bankruptcy Judge.

On October 12, 2001, the court held a hearing on the objection to claims and motion for determination of tax liability of R–P Packaging, Inc. and Plicon Corporation (collectively, "Debtors") to the Muscogee County Tax Commissioner ("Commissioner"). At the conclusion of the presentation of the evidence, the court asked the parties to submit proposed findings of fact and conclusions of law. The court has considered all the briefs and proposed findings and conclusions filed by the parties, the evidence, and the applicable statutory and case law. The court will sustain Debtors' objection to the extent that the Commissioner's claim is inconsistent with the following findings of fact and conclusions of law.

### PROCEDURAL HISTORY

On November 12, 1999, R–P Packaging, Inc. filed a voluntary petition under Chapter 11 of the Bankruptcy Code ("Code"). On June 1, 2000, Plicon Corporation filed its Chapter 11 petition. Debtors continued in the management and operation of their businesses as debtors-in-possession pursuant to § 1107 and § 1108 of the Code. No order for joint administration of Debtors' cases has been entered. However, in accordance with the Joint Plan of Liquidation which was confirmed on August 3, 2001, a single unitary estate has been established. (Doc. 164)[1].

During the course of Debtors' operations, Debtors owned certain personal property consisting of, among other things, machinery, equipment, and inventory ("personal property"). The personal property was used at Debtors place of business located at 4949 Schatulga Road, Columbus, Muscogee County, Georgia.

On December 17, 1999, the Commissioner filed her initial proof of claim in which

1. Unless otherwise indicated, references to court documents are those filed in R–P Packaging, Inc., Case No. 99–42537.

she asserted a priority claim in the amount of $481,625.99. (claim # 28). The Commissioner amended her claim several times and on March 29, 2000, she filed a final amended claim in the amount of $588,700.99. (*See* claim # 108; Doc. # 97, Exh. "A"). This claim consists of taxes which the Commissioner alleges are due for the years of 1996 through 2000.

On June 30, 2000, the court entered an order authorizing the sale of substantially all of Debtors' personal property to Plystar, Inc. ("Plystar") for a purchase price of $1,785,000.00. (Doc. # 76). The order provided that the personal property would be sold free and clear of all liens and encumbrances. The Commissioner's tax liens attached to the proceeds of the sale.

On March 19, 2001, Debtors filed their objection to the Commissioner's claim and a motion for determination of tax liability pursuant to § 505 of the Code. Debtors contend that the valuation of the personal property was too high and in excess of its fair market value for the 1996 through 2000 tax years. Debtors assert that the best evidence of fair market value is the price that could be obtained at an arms length sale. Moreover, Debtors argue that at least a portion of the personal property may not have been subject to tax for the entire period in question because Debtors were entitled to tax abatements.

On June 6, 2001, the court entered a consent order authorizing Debtors to disburse $250,000.00 to the Commissioner. (Doc. # 120). This order provided that the disbursement was to be applied to the Commissioner's claim.

On October 11, 2001, the Commissioner filed a trial brief in support of her position on Debtors' objection and § 505 motion. In her brief, the Commissioner disputes that Debtors were entitled to any tax abatements. In addition, the Commissioner asserts that the fair market value for ad valorem tax purposes is generally ascertained by multiplying the cost of the property by a depreciation factor.

On October 12, 2001, the court held a hearing on Debtors' objection to the Commissioner's claim and motion for determination of tax liability. The following constitutes the court's Findings of Fact and Conclusions of Law.

## FINDINGS OF FACT

The parties have entered into a number of stipulations. As of October 20, 2001, the parties agree that the Commissioner's records indicate that Debtors are indebted to the Commissioner for accrued taxes, interest, and penalties in the amount of $429,423.33, the unpaid portion of which continues to accrue interest. This amount is inclusive of the $250,000.00 court authorized disbursement. The parties also agree that the Commissioner's calculations are based on Debtors' tax returns. The parties also have stipulated that the millage rate for the period in question is 0.041. Therefore, if the court were to accept the appraisal value of Mr. Oliver Juhan, the parties agree that the Commissioner's records would accurately reflect Debtors' tax liability. On the other hand, if the court were to accept the appraisal value proposed by Mark Wilenkin, the parties agree that Debtors' total outstanding tax liability would be $161,114.11. This amount is exclusive of any penalties and interest.

The parties have further stipulated to the value of the inventory. As a result, the value of the inventory for each year in question is as follows: $46,952.00 in 1996; $28,954.00 in 1997; $21,624.00 in 1998; $15,468.00 in 1999; and $219,133.00 in 2000. Therefore, the sole issue before the court is the value of the machinery and equipment ("Equipment") excluding the inventory.

At the hearing, Ms. Jane Worthington testified for the Debtors. Since October 2000, Ms. Worthington has served as the president of the Debtors. Prior to that time, Ms. Worthington served as the director of human resources and the customer service manager. To some extent, Ms. Worthington was involved in the asset sale to Plystar. However, based on Ms. Worthington's testimony, the court finds that she has insufficient knowledge to testify as to the value of the Equipment.

The court likewise finds Mr. Marel Stewart incompetent to testify as an expert as to the value of the Equipment. Mr. Stewart testified that he was employed by Debtors for over forty years where he worked directly with the Equipment. Nevertheless, his testimony failed to demonstrate a satisfactory knowledge as to the valuation of the Equipment.

As to the testimony of Mr. Mark Wilenkin, the court finds him competent to testify as an expert. Although Mr. Wilenkin holds no license or professional designation, he has several years of experience in buying, selling and appraising equipment like that at issue in this case. In addition to conducting all appraisals for his own company, Mr. Wilenkin performs evaluations and appraisals for other companies and accountants.

However, the court does not find Mr. Wilenkin competent to testify as to whether the specific pieces of equipment contained in his appraisal were actually in Debtors' possession at the times in question. While Mr. Wilenkin did inspect the Equipment on November 9, 2000, this was after the sale of the Equipment to Plystar. Therefore, Mr. Wilenkin never inspected all of the Equipment while it was in Debtors' possession. According to his testimony, Mr. Wilenkin's "bench-top"[2] appraisal was based on lists of the Equipment supplied to him by Debtors' counsel and Norman Adler of Norman Levy Associates. (*See also* Wilenkin Dep. at 11–12).

Nonetheless, Mr. Wilenkin held firm to his bench-top appraisal and testified that the present value of the Equipment was $1,998,380.00 as of February 1999. Mr. Wilenkin defined present value as the value of the Equipment if sold in place to a willing buyer by a willing seller. (*See also* Movant's Exh. "1"). Mr. Wilenkin chose the February 1999 date because it was a reasonable mid-point for the period in question. Furthermore, he testified that the value would not have substantially changed during that period.

Mr. Oliver Juhan testified for the Commissioner. The court finds Mr. Juhan competent to testify as an expert on the Equipment. Mr. Juhan is the chief for the personal property division of the Muscogee County Board of Tax Assessors ("Tax Assessors"). He has been a member of the American Society of Appraisers since 1984. From 1974 until the time at which Mr. Juhan joined the Tax Assessors, Mr. Juhan had been an appraiser for the Georgia Department of Revenue. Mr. Juhan testified that since October 1997, he has visited the Debtors' facility each year. During these visits, he personally inspected the Equipment.

Mr. Juhan testified that Georgia law requires taxpayers to return their personal property for fair market value. Mr. Juhan explained that taxpayers such as the Debtors are required to return a Business Personal Property Report ("Return"). (*See e.g.*, Exh R–1). In the Return, taxpayers are required to include the cost of the property with the applicable depreciation. From the information contained in the Return, the Tax Assessors assess the value. If no challenge or appeal is made by the taxpayer within thirty (30) days, this amount constitutes the assessed value

---

**2.** Mr. Wilenkin defined a "bench-top" appraisal as one which is based solely on a list and/or pictures of machinery or equipment.

which is then forwarded to the Commissioner for the calculation of the amount of tax due.

During the 1996 through 2000 tax years, Mr. Juhan testified that the Tax Assessors office used the depreciated cost method in determining the value of Debtors' Equipment. According to Mr. Juhan, the depreciated cost method is the most fair and equitable method for valuing commercial personal property. Although other methods such as sales comparison and income approach are available, Mr. Juhan testified that these methods would not result in the best estimate of the fair market value. For example, Mr. Juhan explained that his appraisal included the cost and installation of the Equipment using non-union labor. The sale of similar equipment in New York likely would be installed with unionized labor. Therefore, a sales comparison in New York would not be very comparable. Furthermore, Mr. Juhan testified that the Georgia Department of Revenue uses the cost depreciation method in determining the value of personal property like that in question in this case.

Mr. Juhan acknowledged, however, that the depreciated cost value does not always result in the best estimate of the fair market value. In many cases, it is often necessary to consider other relevant factors including, but not limited to obsolescence and whether a ready market for the property exists. In the instant case, Mr. Juhan testified that all relevant information provided by Debtors was considered in determining the fair market value of Debtors' Equipment.

For the tax years in question, Mr. Juhan also testified that the value of the Equipment was based on two tax accounts: account number 00135201 ("201 account") and account number P0420401 ("P account"). Only a W & H Olympia 726 CL Press and a General 51" Vacuum Metalizer were included in the P account. The remaining Equipment at issue was included in the 201 account.

For the 1996 tax year, Mr. Juhan testified that the Tax Assessors initially determined that Debtors' Equipment had a fair market value of $6,513,839.00. Primarily, this amount was based on Debtors' own tax return. In addition to depreciation, Mr. Juhan testified that obsolescence factors were applied. Because of idle equipment and capitalized labor, which presumably were not considered, Debtors appealed the Tax Assessors' valuation to the Muscogee County Board of Equalization ("board of equalization"). As a result, the fair market value of the Equipment was reduced to $5,883,773.00. (See Exh. R-1). Mr. Juhan indicated that this value pertained only to the Equipment in the 201 account. Mr. Juhan explained that although a value of $2,599,857.00 on the Equipment in the P account had been assessed, the tax liability resulting from that value had been paid by Debtors. Therefore, there is no issue regarding the valuation of the Equipment in the P account for the 1996 tax year. (See Doc. # 97, Exh. "A").

As to the 1997 tax year, the Tax Assessors valued Debtors' Equipment at $4,753,029.00. According to Mr. Juhan, this amount was exclusive of some idle machinery that was out of service. Also, this amount did not include some machinery which Debtors abandoned when they moved their plant to another location. For these reasons, Mr. Juhan testified that a straight line depreciation method would be fair and equitable as to that year's valuation. (See Exh. R-2).

However, on cross examination, Mr. Juhan testified that the tax liability for the 1997 tax year was based on a $2,414,155.00 assessed value on the Equipment in the P

account and a $5,668,102.00 assessed value on the Equipment in the 201 account. The sum total of the valuations on both tax accounts total $8,082,257.00, an amount which differs from Mr. Juhan's direct examination testimony by $3,329,228.00. Remarkably, Mr. Juhan provided no explanation for this rather large difference in the valuations.

For the 1998 and 1999 tax years, Mr. Juhan testified that he was personally involved in the valuation of Debtors' Equipment. After some adjustments to the 1998 valuation, the Tax Assessors valued the Equipment at $5,073,181.00. (*See* Exh. R–3). A hearing before the board of equalization was conducted. According to Mr. Juhan, the board of equalization valued the Equipment in the P account at $1,050,000.00. As to the Equipment in the 201 account, a new value of $2,320,256.00 was assessed. The Tax Assessors appealed to the superior court, but this appeal was interrupted by the filing of Debtor's bankruptcy case.

For the 1999 tax year, some revaluations occurred. Mr. Juhan testified that he discovered a laser device which had not been previously reported. After the revaluations, the Tax Assessors determined the total value of all equipment and inventory to be $5,806,830.00. Mr. Juhan testified that Debtors never challenged this assessed amount. (*See* Exh. R–5). Mr. Juhan further testified that the P account Equipment was valued at $1,864,623.00 and the 201 account Equipment was valued at $4,812,177.00. The increased value in the 201 account was a result of the newly discovered laser. Based on the account information, the total assessed value of the Equipment excluding the inventory was $6,676,800.00. However, similar to the 1997 valuations, Mr. Juhan provided no explanation for the discrepancy between $5,806,830.00 and $6,676,800.00. Further,

if the $15,468.00 value of the inventory, an amount on which both parties agree, is deducted from the $5,806,830.00 amount, a greater discrepancy results.

For the 2000 tax year, the Tax Assessors valued all of Debtors' personal property at $4,862,172.00. Mr. Juhan testified that this amount included the Equipment, fixtures and inventory. Accordingly to Mr. Juhan, Debtors never challenged this amount. Despite Mr. Juhan's testimony, Debtors' 201 account Return provides that all personal property was valued at $4,022,636.00. (*See* Exh. R–6). Mr. Juhan testified that no return was filed on the P account for the 2000 tax year, therefore, the same value as the prior year without any depreciation would be assessed. Accordingly, $1,864,623.00 was assessed to the P account. As to the Equipment in 201 account, $4,232,458.00 was assessed to that account.

## CONCLUSIONS OF LAW

The authority for the court to determine tax liability is found in § 505 of the Code. In pertinent part, § 505(a) of the Code provides:

(a)(1) Except as provided in paragraph (2) of this subsection, the court may determine the amount or legality of any tax, any fine or penalty relating to a tax, or any addition to tax, whether or not previously assessed, whether or not paid, and whether or not contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction.

(2) The court may not so determine—

(A) the amount or legality of a tax, fine, penalty, or addition to tax if such amount or legality was contested before and adjudicated by a judicial or administrative tribunal of competent jurisdiction before the commencement of the case under this title;

11 U.S.C. § 505(a); *see also In re Koger Properties, Inc.,* 172 B.R. 351, 352 (Bankr.M.D.Fla.1994)(holding that except for the limitation in § 505(a)(2) of the Code, "the bankruptcy court has jurisdiction to determine the amount or legality of any tax, fine or penalty for which the debtor is liable."). Although the parties have raised the issue of abstention, neither party has addressed the jurisdictional issue which § 505(a)(2)(A) of the Code presents. Thus, the court will first address jurisdiction under this subsection.

■ Under § 505(a)(2)(A), the court is without jurisdiction to determine the tax liability if such determination was "adjudicated by a judicial or administrative tribunal" before the case was filed. *See In re Onondaga Plaza Maintenance Co.,* 206 B.R. 653, 656 (Bankr.N.D.N.Y.1997)(holding that the court was without authority pursuant to § 505(a)(2)(A) to determine the debtors' tax liability because the tax liability was contested and adjudicated by the city's assessment board of review before the case was filed); *In re Washington Mfg. Co.,* 120 B.R. 918, 919-20 (Bankr. M.D.Tenn.1990)(no authority because the county board of equalization denied debtors' prepetition request for a lower appraisal); *In re Ishpeming Hotel Co.,* 70 B.R. 629, 632 (Bankr.W.D.Mich.1986)(res judicata on tax liability issue because the debtor contested the assessors' valuations and appeared before the municipal board of review prior to its bankruptcy case).

In this case, the evidence demonstrates that the board of equalization adjudicated the valuation of Debtors' Equipment for the 1996 and 1998 tax years. There is no direct evidence as to whether the 1996 and 1998 determination by the board of equalization occurred prepetition. However, given Mr. Juhan's testimony that a taxpayer has thirty (30) within which to appeal to the board of equalization, the court must conclude that the 1996 determination occurred prepetition. Therefore, the court finds that the court is without jurisdiction to determine Debtors' tax liability for the 1996 tax year.

As to the 1998 tax year, Mr. Juhan testified that the filing of Debtors' case interrupted the Tax Assessors' appeal of the valuation by the board of equalization. Because that determination has been appealed, the court finds that the 1998 tax liability has not been fully adjudicated as defined in § 505(a)(2)(A) of the Code. *See Texas Comptroller of Public Accounts v. Trans State Outdoor Advertising Co. (In re Trans State Outdoor Advertising Co.),* 140 F.3d 618, 621-22 (5th Cir.1998)(holding that debtor's tax liability could have been determined by the bankruptcy court if debtor had filed its petition before the decision of the Comptroller became final); *Lipetzky v. Dep't of Revenue of the State of Montana (In re Lipetzky),* 64 B.R. 431, 434 (Bankr.D.Mont.1986)(holding that the bankruptcy court has jurisdiction to determine debtor's tax liability because no final decision had been entered in the state court appeal). Accordingly, the court has jurisdiction to review the 1998 valuations and make a tax liability determination for that year.

■ As to the abstention issue raised by the parties, the court agrees with Debtors that abstention would not be appropriate. Under § 505(a)(1) of the Code, the court may abstain from making a determination of tax liability. Because § 505(a)(1) provides that the court "may" determine tax liability, the exercise of jurisdiction under this subsection is discretionary. However, courts typically have analyzed several factors before determining whether abstention is proper. *See Thornton v. United States (In re Thornton),* No. 92-40405, 1995 WL 442192, at *6 (Bankr.

M.D.Ga. June 23, 1995)(Laney, J.); *Gossman v. United States (In re Gossman)*, 206 B.R. 264, 266 (Bankr.N.D.Ga.)(Murphy, J.). As Debtors have pointed out, this court in *Thornton* looked at factors such as the complexity of the tax issues, efficient and orderly case administration, the court's docket, and trial time. *Thornton* at *7; *see also Gossman* at 266. In evaluating these factors, courts primarily consider whether a bankruptcy purpose would be served. *See Gossman* at 267.

In the instant case, the court agrees with Debtors' analysis of these factors. Accordingly, the court will not abstain from exercising its jurisdiction under this subsection.

■ In determining the tax liability under § 505(a)(1), the court must apply the substantive aspects of state law. *See Blue Cactus Post, L.C. v. Dallas County Appraisal District (In re Blue Cactus Post)*, 229 B.R. 379, 386 (Bankr.N.D.Tex.1999)(citing *Arkansas Corp. Comm'n v. Thompson*, 313 U.S. 132, 142, 61 S.Ct. 888, 85 L.Ed. 1244 (1941)). The fact that a debtor/taxpayer did not comply with the procedural requirements under state law in contesting a tax assessment is irrelevant under § 505(a)(1) of the Code. *See id.* at 386–87. Accordingly, the court will apply Georgia law.

Pursuant to O.C.G.A. § 48–5–6, taxpayers are required to return their property at its fair market value for the purposes of ad valorem taxation. Georgia law defines "fair market value" as the amount "a knowledgeable buyer would pay for the property and a willing seller would accept for the property at an arm's length, bona fide sale." O.C.G.A. § 48–5–2(3). As to the valuation of equipment and machinery in which no ready market exists, "value may be determined by resorting to any reasonable, relevant, and useful information available including, but limited to, the original cost of the property, any depreciation or obsolescence...." *Id.*

■ In this case, the court finds that Mr. Wilenkin's bench-top appraisal was consistent with Georgia law. Pursuant to Mr. Wilenkin's testimony, he defined "present value," the term used in his appraisal, as the value of the Equipment if sold in place to a willing buyer by a willing seller. Thus, "present value" is sufficiently consistent with "fair market value" as defined in O.C.G.A. § 48–5–2(3). Also, Mr. Wilenkin's use of comparable sales in arriving at his appraisal qualify as "reasonable, relevant and useful information" as contemplated in O.C.G.A. § 48–5–2(3). However, the court notes that Mr. Wilenkin did not personally appraise the Equipment at issue. Moreover, he assigned the same value to the Equipment for each year in question contending that the value of the Equipment would not have substantially changed during the period in question.

The court also finds that the Tax Assessors complied with Georgia law in determining the value of Debtors' Equipment. In addition to straight line depreciation, the evidence demonstrates that the Tax Assessors used cost and obsolescence factors when applicable. *See* O.C.G.A. § 48–5–2(3). This is not to say, as pointed out by Debtors, that the Tax Assessors enjoy a presumption of correctness. *See Macon–Bibb County Brd. of Tax Assessors v. J.C. Penney Co., Inc.*, 239 Ga.App. 322, 324, 521 S.E.2d 234, 236 (1999). In contrast to Mr. Wilenkin's appraisal, the Tax Assessors personally inspected the Equipment and valued the Equipment for each year in question. The court disagrees with the Tax Assessors on the use of comparable sales. The Tax Assessors should have considered comparable sales.

The primary difficulty, however, with the Tax Assessors' valuation is the discrep-

ancy in their own valuations for each year in question. Given this discrepancy and the fact the Tax Assessors failed to consider comparable sales factors, the court will give some weight to the appraisal of Mr. Wilenkin.

For the 1997 tax year, the Tax Assessors assessed Debtors' tax accounts at $8,082,257.00 but testified that they valued the Equipment at $4,753,029.00. The court can make no conclusion regarding this disparity. For each year in question, Mr. Wilenkin appraised the Equipment at $1,998,380.00. In the prior year, Debtors accepted $2,599,857.00 as the value for just two pieces of Equipment. Accordingly, the court cannot accept Mr. Wilenkin's value but will give Debtors the benefit of the Tax Assessors lowest valuation. Therefore, the court finds the value of the Equipment for the 1997 tax year to be $4,753,029.00.

As to the 1998 tax year, the court accepts the valuation of the Equipment as set forth by the board of equalization. This gives some weight to Mr. Wilenkin's appraisal which considered comparable sales. As a result, the court finds that the value of the Equipment for the 1998 tax year is $3,370,256.00.

For the 1999 tax year, Mr. Juhan testified that the assessed value increased from the prior year because of a laser device he discovered which was not reported in prior years. Mr. Wilenkin's appraisal mentions nothing about the laser. As a consequence, the court will give Mr. Wilenkin's appraisal no weight. Nevertheless, because the Tax Assessors failed to consider any comparable sales factors, the court again will give Debtors the benefit of the Tax Assessors lowest appraisal which is $5,806,830.00.

As to last year in question, the Tax Assessors have testified to two different valuations. Further, the Tax Assessors have presented Debtors 201 account Return for 2000 which shows yet a third valuation amount. (*See* Movant's Exh. 6.) The court finds this unremarkable. Because Mr. Wilenkin's appraisal did not include the laser, the court cannot accept his appraisal. The evidence shows that Debtors did not challenge the assessed value for the 2000 tax year. Therefore, the court will accept the value as indicated in their 201 account Return for the 2000 tax year. Given the $4,022,636.00 value for all personal property less the undisputed value of the inventory, the court finds the value of the 201 account equipment to be $3,803,503.00. The only testimony as to the value of the equipment in the P account was $1,864,623.00. Accordingly, the total value for the Equipment for the 2000 tax year is $5,668,126.00.

### *CONCLUSION*

As to the 1996 tax year, § 505(a)(2) of the Code prohibits the court from determining Debtors' tax liability. For the remaining years in question, the court will value the Equipment as follows:

| | |
|---|---|
| 1997 | $4,753,029.00 |
| 1998 | $3,370,256.00 |
| 1999 | $5,806,830.00 |
| 2000 | $5,668,126.00 |

Therefore, the court will sustain Debtors' objection to the Commissioner's claim to the extent that the Commissioner's claim is inconsistent with these values.

An order in accordance with this Memorandum Opinion will be entered.